## SYKES et al. v. SYKES et al.

1. To constitute a nuncupative will, the words spoken must have legal certainty, and be intended as a will.
2. And they must be spoken *in extremis.*

THIS was a bill in Chancery, filed in Morgan Circuit Court, in December 1827, by Richard Sykes, for himself, and as guardian for, and next friend of Robert Sykes, William Sykes, and Rebecca Sykes, infants, against James T. Sykes, administrator with the will annexed, and James Sykes, an infant, for the purpose of setting aside a nuncupative will, which had been admitted to probate as the will of John Sykes the deceased brother of the complainants.

The bill charged that John Sykes, died intestate, about the 3d of February 1827, leaving real and personal property, greatly exceeding one hundred dollars in value; and that the complainants and James Sykes were his lawful

heirs and distributees; that a nuncupative will was proved
and recorded on the oath of Joseph Sykes, in Morgan
county Court; the record of which is in these words:

"Being at John Sykes' on the 2d day of February 1827,
he being weak in body, but I believe sound in mind and
memory, I asked him what he thought of his situation, if
he thought he ever should get well, he once thought so.
I asked him in case he should die, the way we must all
go, what he wanted done with his property; he observed
he wanted his brother James to have it all. He died on
the 3d day at night, somewhere about two o'clock. This
4th of February 1827. JOSEPH SYKES."

It is further alleged, that the words were spoken in the
presence of only one person, the said Joseph Sykes; that
the declarations were loosely made, a day or two before his
death, when he was doubtful if he would recover or die;
that the witness was not called on to hear the words as the
last will of the deceased, but that the words were spoken
in answer to casual questions, made to him by said witness;
that at the time, he was completely able to have made a
will in writing, with all due solemnities; that the said sup-
posed will had been admitted to record without due sol-
emnity; that the complainants reside in Virginia, and had
no notice of the probate. The complainants charged that
the defendant, James T. Sykes, had procured letters of
administration, with the will annexed, and would pro-
ceed to deliver the estate to James Sykes; and they pray-
ed that the probate and will might be set aside, and that
distribution be made as in cases of intestacy between the
brothers and sister. The written statement was sworn to
before the Judge of the county Court of Morgan county,
on the 23d of May, and ordered to be recorded.

James T. Sykes, the administrator, and Joseph Sykes,
as guardian for the infant, James Sykes, answered: They
admit the deceased died at the time mentioned in the bill,
leaving two quarter sections of land, and ten or twelve
negroes; but deny the intestacy. Joseph Sykes says that
the deceased had been sick for ten or twelve days, part of
the time being pretty well, walking about in the early
part of his sickness, and until about one week before he
died, when he was taken very ill, and confined to his bed;
that he believes he was of sound mind and sensible, when
he declared his will; he referred to the sworn statement
as being true, and stated it was reduced to writing on the

JANUARY 1830.

Sykes et al.
v.
Sykes et al.

4th of February, about two days after the words spoken; that the words were spoken in his presence, alone at the time, but that he had declared the same intention to two other persons, about the 20th of January previous. They answer, they believe fully his intention was as expressed. They further answer, that the deceased became partially insane some time in the night after making this will, and so continued till his death, which occurred about thirty hours after. The answer further states, that the deceased appeared to be under the belief, when he spoke the words, that he would die. It is also denied that the words were casually spoken, but that the questions were asked, and the inquiry made fairly with the view and purpose to learn what disposition the deceased wished to be made of his property after his decease.

Murphy, a witness for the defendants, deposed that the deceased stated, about a month before his death, that he was very much attached to his brother James, and that if he were then to die, he would bequeath him all his property; and that if he were married, and had no children, he would leave him one half of his estate.

Bulloch, another witness, deposed, that about fifteen or twenty days before his decease, the intestate said, that in case of his death, he wished his brother James to have the whole of his property.

Sturgis, says he visited the deceased as a physician, and that, with the exception of three or four hours, he was with him from an hour before sunset on Friday evening, till his decease, which occurred on Saturday night, about two o'clock; that during that time, he was not in a situation to have made any disposition of his property, or to come to a correct conclusion on any subject; that he was too weak to have written a will, and delirious.

It was admitted, that during the illness of the deceased, he had every ordinary facility to have written his will, as pen, ink, paper and attending friends; and that he could write, when physically able. Also, that the deceased had declared himself more partial to his brother James, who had come with him to this country, and lived with him at the time of his death, than towards his other brothers and sister, who lived in Virginia.

The cause was heard before Judge Gayle, at April term 1828, who rendered a decree, dismissing the bill, and establishing the will. To reverse which decree, the complainants sued their writ of error to this Court.

CLAY and M'CLUNG, for the appellants, argued that the evidence was insufficient to establish the words as a will; that they were not intended by the deceased as a will, and that no words could be established as a nuncupative will, unless spoken *in extremis,* and when there was neither time nor opportunity to make a written will. *a*

HOPKINS and BRANDON, contra, argued that the decree was proper, because: 1st, one witness is sufficient to establish a nuncupative will, and it is sufficient to prove by evidence the *animus testandi* of the deceased. *b* 2d, the proof establishes that the will was made according to his intention long before expressed; *c* and 3d, because it was made at his own house, in his last sickness, just before he died, and he was unable after making it, to have made or written any other. *d*

By JUDGE WHITE. In revising this decision, two main questions present themselves for our consideration: First, did the words spoken by the deceased, on the Friday before his death, manifest with sufficient legal certainty, that they were intended as his will; and secondly, were they spoken in that extremity in which alone the law authorizes a nuncupative will to be made. Toller, defines a will or testament to be "a legal declaration of a party's intentions, which he directs to be performed, after his death.". When this declaration is reduced to writing, with the ordinary solemnities, there remains no question as to the intent of the testator to make his will. And if I mistake not, an examination of the cases at common law, of the disposition of personal estates by testament, will shew that the Courts have, at all times, been particularly careful to see that the *animus testandi* was fully proven before they would establish a will. Hence, even the reducing of a man's intention to writing, or directing it to be done, would not, if left incomplete, except under peculiar circumstances, be considered as his will; and the policy of our law has been from the earliest ages, to favor written wills; one motive for which, no doubt was, that the design of the testator might be clearly exhibited. Even in the days of remote antiquity, when reading and writing were such rare accomplishments as to confer peculiar privileges, nuncupative wills were not established, except when made *in extremis;* and experience soon taught our forefathers, that the license of the common law,

JANUARY 1830.

Sykes et al.
v.
Sykes et at.

*a* Laws of Ala, 883-4. 20 John. Rep. 502. 2 Blkst: Com. 500.
*b* Laws of Ala. 882-3--4. 3 Thomas' Coke, 341--2-3 & notes 20 and S.

*c* 2 Blk. Com. 500-1-2-3 and note 16. 1 Munf. R. 456.
*d* Blkst. Com. 501-2-3, note 16. Toller's Executors, 3-4, note 2, 59. 4 Henn. &. Munf. 91.

JANUARY 1830.

Sykes et al.
v.
Sykes et al.

though narrowed to so small a compass, was still too great for the good of society. The celebrated case of *Coles v. Mordaunt*, in the 28*th* of *Charles II.*, in which it is reported, that out of nine witnesses, sworn to prove a nuncupative will, almost all were perjured, and Mrs. Coles, herself, guilty of subornation of perjury, manifested that the temptation was too strong for human nature, and led soon after to the salutary statute of the 29*th* of *Charles II.*, which with but slight variations, has been incorporated into our code. The numerous precautions and requirements of this statute have almost, (to use the language of Blackstone,) brought nuncupative wills into entire disuse. Great particularity is necessary to establish them, and nothing is of more importance than a clear manifestation of the *animus testandi;* therefore it is, that the statute requires that "the testator should call on the persons present at the time of making such will, or some of them, to take notice, or bear testimony, that such was his will, or to that effect."

In the case before us, there was no particular call on the witness to take notice, &c. but it is contended that it was to that effect. What the deceased said, was in answer to a question put to him by the witness. This, of itself, does not prove that he had not the requisite *animus testandi;* but we are sustained by high authority in saying, that in such a case the Court should be more upon their guard against importunity, more jealous of capacity, and more strict to require evidence of clear intention than in ordinary cases. The facts shew, that in previous conversations, the deceased had expressed the same design to leave his property to his brother James, which he did on the Friday before his death; and as there was nothing peculiar in his last expressions on the subject, it may be fairly argued, that though they, together with what he had before said, evinced the inclination of his mind as to the disposition of his property, yet, that he did not intend them as the declaration of his will. Had this been his design, it is both reasonable and natural to suppose, that he would have accompanied his expressions with words more emphatic and unequivocal; and if we admit that he was conscious of the near approach of his dissolution, it is stranger still, that when the subject was brought to his recollection, by the question of the witness, he did not avail himself of the few remaining moments, either to have his will written, or to express it with a clear and unambigu-

otis manner and intent. To me, it is evident, that though he did design to leave his property to his brother James; yet, either from a fluctuating state of mind, an unwillingness to do an act which brought the contemplation of death immediately before him, or deceived by a delusive hope of recovery, he did not make, or at any one time design to make his will, within either the words or spirit of the statute. As to the second point, it is worthy of remark, that our statute adopts the words of the 29th of *Charles II.*, that nuncupative wills must be made "in the time of the last sickness;" and these expressions, as appears by the case cited from 20th Johnson, 502, have been construed by the Courts to mean, *in extremis.* These latter expressions, as appears from the same authority, were understood by the writers before the 29th of *Charles II.*, when applied to this subject, to mean the veriest extremity, when a man, in the words of Perkins, "lieth languishing for fear of sudden death, and dareth not to stay the writing of his testament." Chancellor Kent sustains the same idea, by observing, that there is a strong analogy between these nuncupative wills, and a gift upon the death bed, or a *donatio causa mortis,* and these gifts, he says, are defined in the very terms of a proper nuncupative will. A *donatio causa mortis,* is where a man lies in extremity, or being surprised by sickness, and not having an opportunity of making his will, but lest he should die before he should make it; gives away personal property with his own hands." Then, to apply these explanations of *in extremis* or last sickness, to the case at bar, the deceased had time, had he been so disposed, after his expressions referred to, to have procured the writing of his will; he had friends and all the ordinary facilities at hand; but he did not do it, or express a desire to have it done. He must then, either have been indisposed at the time to make his testament, or aroused by the perilous extremity of his condition; he would have evinced something of that hurried anxiety which fearful necessity seldom fails to produce. Nothing, however, of this is in proof, but a simple expression only, that if he should die, (implying at least some degree of doubt,) he wished his brother James to have all his property. Upon the whole, I am well satisfied, that the indispensable requisite of the *animus testandi* is wanting in the case, and that it is perhaps more than doubtful, whether the deceased, at the time of using the expressions recorded as his will, was in that

47

JANUARY 1830.  extremity of condition, which would authorize him to
make a nuucupative will.  The decree then, dismissing
Sykes et al.   the bill, was erroneous and must be reversed, and this
v.             Court proceeding to render such decree as should have
Sykes et al.   been made below, order, adjudge and decree, that said
nuncupative will be vacated, and set aside and that James
T. Sykes, the administrator, proceed to distribute the es-
tate of said John Sykes, deceased, according to law.

Decree reversed and rendered.