# REPORTS

### OF

# CASES, ARGUED AND DETERMINED

### AT JANUARY TERM, 1862.

―――――――

## ISHAM (A SLAVE) vs. THE STATE.

[INDICTMENT AGAINST SLAVE FOR HOMICIDE OF WHITE PERSON.]

1. *Homicide of white person by slave.*—If a slave kills a white person, believing him at the time to be a runaway negro, and being justified by the attendant circumstances in the belief, the degree of the homicide—whether murder, voluntary manslaughter, or involuntary manslaughter—is the same that it would have been if the person slain had been a runaway negro; but the punishment of the offense is that prescribed for such degree of homicide when perpetrated by a slave on a white person.

2. *Conviction of less offense than charged in indictment.*—Under an indictment charging a slave with the voluntary manslaughter of a white person, a conviction may be had for involuntary manslaughter in the commission of an unlawful act.

FROM the Circuit Court of Jefferson.

Tried before the Hon. WM. S. MUDD.

THE indictment in this case contained three counts; the first charging that the prisoner, who was a slave, the property of Capt. W. F. Hanby, "unlawfully, and with malice aforethought, killed George M. Hagood, by shooting him

with a gun;" the second, that he "unlawfully and intentionally, but without malice, killed George M. Hagood, a white person," &c.; and the third, that he "unlawfully, but without malice or the intention to kill, killed George M. Hagood, a white person," &c. The circuit court sustained a demurrer to the third count, and the prisoner pleaded not guilty to the other counts.

"On the trial," as the bill of exceptions states, "the prosecution introduced a witness, who testified, that, on the night the deceased (who was a white man) was killed, he, in company with the deceased and two other white men, went by agreement to the house of the prisoner's master, (all the white family being absent,) for the purpose of catching a runaway slave, who was said to be lurking about the place, and of detecting the prisoner in harboring said runaway, if guilty of so doing; that the deceased and himself disguised themselves, by blacking themselves, putting on old clothes, and having a budget tied up in a handkerchief; that they went near the negro house, and made a noise there, and then went to the corner of the house, and struck on it with a stick; that the dog barked fiercely during the time, and the prisoner hissed on the dog; that the prisoner came round the house, and, as soon as he got in sight, asked, 'Who are you?' that the deceased replied, 'A partner,' and, as soon as the reply was out, the prisoner fired, and killed the deceased; that he (witness) then said, 'Don't shoot, you have killed Mansfield;' that the prisoner replied, "Lord, Massa George, why didn't you speak?' and that the prisoner remained until morning, assisting to wash and lay out the deceased, and was arrested in the morning. There was other testimony, confirming said witness, and showing that said party went to watch Capt. Hanby's house in disguise by consent and agreement with him. There was testimony tending to show, also, that some person had been seen by night about said premises, while Capt. Hanby was absent in camp drilling his company; that on the night before the killing, the prisoner had taken the gun, in presence of his mistress, and run out some distance from

Isham (a slave) v. The State.

the house, and shot (as he said) at some person. It was in proof, also, that the prisoner, on the morning before the killing, asked his mistress for the gun, to carry to the field; that she refused, and forbade his having or taking the gun; and that he took the gun from the house, on the night of the killing, without the knowledge or consent of his master or mistress, and during the absence of the white family from home.

"The prisoner asked the court to charge the jury as follows: 'If the jury believe, from the evidence, that the deceased disguised himself, by blacking himself, and the manner in which he was clothed, for the purpose of deceiving the prisoner, and making him believe that he was a runaway slave; and, under such disguise, went to the prisoner's house on his master's premises, at an unusual hour of the night, between midnight and day; and there, by his disguised condition, and the manner in which he acted, deceived the prisoner; and that the prisoner, in truth and in fact, believed that the deceased was a runaway negro slave, and, under that delusion, shot and killed the deceased, then he is neither guilty of murder, nor of the voluntary manslaughter of a white person, nor of the involuntary manslaughter of a white person in the commission of an unlawful act.' The court refused this charge, and the prisoner excepted.

"The court charged the jury, that the counts in the indictment included the charge of involuntary manslaughter; to which charge, also, the prisoner excepted."

The verdict of the jury was, "Guilty of voluntary manslaughter, as charged in the second count of the indictment."

E. W. PECK, for the prisoner.—By the criminal law, a man may safely act upon appearances; and if he acts in good faith, their falsity does not in any manner increase his guilt or criminality.—*Meredith v. Commonwealth*, 18 B. Monroe, 49; *Shorter v. People*, 2 Comstock, 197. This principle is, in substance, recognized in *Oliver's* case,

(17 Ala. 587,) and in *Carroll's* case, (23 Ala. 28.)   The act
itself does not make a man guilty; to constitute a crime,
the act and intent must both occur.—Broom's Legal
Maxims, 211, 212, 221; 7 Term Rep. 514; Hale's P. C.
509.   "If a man, intending to kill a thief, or a house-
breaker, in his own house, happen by mistake to kill one
of his own family, it cannot be imputed to him as a crime."
3 Cro. Rep. 538.

In this case, there was no malice of the will—no cor-
rupt intent on the part of the prisoner.   In the absence of
his master and mistress, he was left at home the guardian
and protector of their house and property.   Danger of
mischief was justly apprehended, some unknown person,
supposed to be a runaway slave, having been seen prowl-
ing about at night.   The deceased and his party disguised
themselves as runaway slaves, and, by their conduct, in-
duced the prisoner to believe that they were in fact what
they assumed to be.   Acting on this belief, the prisoner
committed no crime, in attempting to protect his master's
house and property.   If his act was not strictly lawful, it
was at least excusable.   As to the degree of caution which
must be exercised, where a homicide is committed under an
honest mistake of fact, see Foster's Crown Cases, 263–65.

2. The affirmative charge of the court is erroneous.


M. A. BALDWIN, Attorney-General, *contra.*—1. The
charge asked by the prisoner asserts three distinct propo-
sitions, each of which is untenable; namely, that the
prisoner, on the facts supposed, would not be guilty of
any one of the three specified offenses—murder, the volun-
tary manslaughter of a white person, or the involuntary
manslaughter of a white person in the commission of an
unlawful act.   As murder, when committed by a slave,
whether by killing a white person or a negro, is precisely
the same offense, and subject to the same punishment, the
first proposition is manifestly erroneous.   As the prisoner
was guilty of an unlawful act in having the gun, (Code,
§ 1012,), as well as in shooting it, he was at least guilty of

the involuntary manslaughter of a white person in the commission of an unlawful act; to constitute which offense, a knowledge of the *status* of the person slain is not a necessary ingredient; consequently, the last proposition asserted by the charge is also erroneous. Whether the prisoner was guilty of voluntary manslaughter, or the voluntary manslaughter of a white person, depended upon other facts than those hypothetically stated in the charge, and was to be determined by a consideration of all the facts in the case. Although, to constitute a crime, an evil act and an evil intent must both concur; yet a man may intend to commit one wrong, and, failing in it, commit another; in which case, the wrong intended and the wrong done coalesce and create the crime.—1 Bishop on Criminal Law, 254; Wharton, § 965. The mere fact that the prisoner believed the deceased to be a runaway slave, would afford him no protection, if he had the means of ascertaining the true facts, and did not do so.—1 Bishop's Crim. L. 242; Wharton, § 1005; *Barnes v. State*, 19 Conn. 398; *Commonwealth v. Marsh*, 7 Metcalf, 472; *United States v. Liddle*, 2 Wash. C. C. 205; *United States v. Ortega*, 4 Wash. C. C. 530; *United States v. Benners*, 1 Baldwin's C. C. 240.

2. The affirmative charge of the court is sustained by the decision in *Henry's* case, 33 Ala. 389.

A. J. WALKER, C. J.—The charge asked by the prisoner, and refused by the court, involves the assertion, that the prisoner could not be guilty of murder, because the homicide was committed under the delusion that the deceased was a runaway slave, and that delusion was justified by the attendant circumstances. In so far as the charge involves that assertion, it was obviously wrong. A homicide, committed by a slave, under such circumstances as would constitute murder, would be the same offense, and subject to the same punishment, whether the deceased was a white person or a negro; and it could make no difference, in that case, that the prisoner supposed the deceased to be slave.—Code, § 3312.

The charge, however, was designed to assert, that a slave, slaying a white person, under the delusion and belief, justified by the circumstances, that the person killed was a runaway negro, would not be guilty of the voluntary manslaughter of a white person, nor of the involuntary manslaughter of a white person in the commission of an unlawful act; although, if the appearances had been true, he would have been guilty of the voluntary or involuntary manslaughter of a slave. This proposition is important, because a higher grade of punishment is prescribed, where those offenses are perpetrated by a slave upon a white person, than is prescribed where they are perpetrated upon a negro.—Code, §§ 3313, 3314. To support the proposition, it is asserted as a correct principle, that the guilt of a party of any particular offense is to be determined in the light of the circumstances as they appeared to him; and that, therefore, the prisoner cannot be guilty of the manslaughter of a white man, because it falsely appeared to him that the object slain was not a white man. We do not concede the principle so asserted, in the latitude in which it is thus stated. It stands opposed to the doctrine which authorizes a conviction of one offense, when the accused committed it while designing and endeavoring to perpetrate another.

The true doctrine, as we conceive, is, that "where a party, without fault or carelessness, is misled concerning facts, and acts as he would be justified in doing if the facts were what he believes them to be, he is legally, as he is morally innocent."—1 Bishop's Cr. Law, § 242. The charge asked and refused is at war with this principle; for it assumes that, no matter what the degree of guilt which would have existed if the appearance that the person slain was a negro had been true, the accused can not be guilty of the homicide, in any of its degrees, of a white person. The effect of it is, that although the accused would have been guilty of the murder or manslaughter of a negro, if the appearances had been true, he cannot be guilty of the murder or manslaughter of a white man, the appearances being false. The inevitable result of this doctrine would

be, that the accused, although guilty of murder or man-slaughter, could not be convicted of any offense. He could not be convicted of killing a negro, because in fact he killed a white man ; and he could not be convicted of killing a white person, because the appearances superinduced and justified the belief that he was killing a negro.

It is not indispensable to the constitution of a crime, that the prisoner should commit the very act intended. Certainly, there must concur a wrongful intent, and a wrongful act. But he who, aiming to accomplish one wrongful act, fails in that, but perpetrates another, is not excused. The wrongful intent, and the wrongful act, are said to coalesce and make the crime.—Bishop on Cr. Law, § 254. Numerous illustrations of this doctrine are to be found in the books. Where there is a design to commit a felony, and a homicide en-sues, against or beyond the intent of the party, he is guilty of murder ; but, if the intent went no further than to commit a bare trespass, it will be manslaughter.—1 East's Cr. Law, 255. If A gives a poisoned apple to B, intend-ing to poison B ; and B, ignorant of it, gives it to a child, who takes it and dies, A is guilty of the murder of the child, but B is guiltless. And so, if one, out of malice at A, shoots at him, but misses him, and kills B, it is no less murder than if he had killed the person intended.—Whar-ton's Cr. Law, § 965. These illustrations will suffice to show, that to the conviction of a slave for the homicide of a white man, it is not indispensable that there should exist an intent to kill a white person, or even a knowledge that the deceased was a white man. Indeed, one may be guilty of involuntary manslaughter, where there was no intent to kill. A homicide, resulting from an attempt to commit any unlawful act, would be manslaughter ; and therefore, if a slave should shoot unlawfully at a beast, and by chance kill a white person, he would be guilty of the involuntary manslaughter of a white person in the commission of an unlawful act, although he might be ignorant of the prox-imity of the person slain. Surely, the crime could not be less, if the purpose was to kill a negro instead of a beast ;

and yet such is the conclusion to which the argument for the prisoner would lead. The statute does not make a knowledge that the deceased was a white person an ingredient of the offense, and we cannot decide that it is. There being a criminal intent, the defendant is guilty, notwithstanding he was mistaken as to the person upon whom his unlawful purpose fell.—See the authorities collected in 1 Bishop on Cr. Law, § 247, and on the attorney-general's brief.

The 15th of Lord Bacon's maxims is as follows: "*In criminalibus, sufficit generalis malitia intentionis, cum facto paris gradus.*"—3 Bacon's Works, 238; Broom's Legal Maxims, 238. In reference to this maxim, the learned author says: "All crimes have their conception in a corrupt intent, and have their consummation and issuing in some particular fact; which, though it be not the fact at which the intention of the malefactor leveled, yet the law giveth him no advantage of that error, if another particular ensue of as high a nature." We do not find this maxim so recognized by subsequent writers on the criminal law, and by those adjudging criminal causes, as to induce us without hesitation to adopt it as a correct exposition. The explanation of the maxim would seem to imply, that, to constitute the crime, it is only necessary that the act should be of as high a nature as the intent; and not to imply a denial that the crime might take its complexion from an act of criminality higher than the intent. If this be the construction, it would not aid the accused. If the maxim import that there must be a perfect correspondence between the intent and the act, it can not be harmonized with principles too well established to be controverted. A homicide, not intended, but committed, in the perpetration of burglary or arson, would be murder, notwithstanding the offenses intended are not, in our law, of as high a grade, or subject to as severe penalties, as murder. We shall not engage in any speculation as to the true import and operation, or the authority, of the maxim, but shall content ourselves with announcing the conclusion, that we

cannot be led by it to oppose the proposition which we now proceed to state, as follows:

A slave, who kills a white man, intending to kill a negro, is guilty of a criminal homicide in the degree in which he would have been guilty if the person slain had been a negro; and he is subject to the punishment prescribed for the commission of the offense upon a white person. The maxim, in its literal translation, only requires, that the act should be of equal grade with the intent; not that the same punishment should be incident to the thing done as to the thing intended. Crimes may be of the same degree, and yet subjected by law, founded in public policy, to different punishments. The manslaughter of a white man by a slave, and the manslaughter of a negro by a slave, belong to the same degree of homicide, and yet are subjected to variant punishments. So, also, manslaughter committed with a bowie-knife, and manslaughter committed with a different weapon, are offenses of the same degree, and yet there is a distinction made in the punishments prescribed. Numerous other illustrations might be drawn from our criminal law. In all those cases, as in this, the difference is not in the degree, but in the punishment; and the difference in the punishment is the result of some incident to the crime, which from public policy the law makes an aggravation. If, therefore, we take the maxim in its literal import, we find nothing inconsistent with our position.

In the case of *Bob v. The State*, (29 Ala. 20,) it was argued, that the prisoner, a slave, when committing an assault and battery upon another slave, by accident struck and killed the deceased, who was a white person. In reference to that aspect of the case, this court said: "We hold, that if a slave, in the attempt unjustifiably to commit an assault, or assault and battery, on another slave, kill a white person by misadventure, he is guilty of involuntary manslaughter, under section 3312 of the Code." This is an express adjudication of the point made in this case, that a slave can not be guilty of the manslaughter of a white

person, when the intent was aimed at a negro. If one intending to beat a negro, and unintentionally killing a white person, is guilty of the homicide of a white person; *a fortiori*, is a slave thus guilty, when, intending to *kill* a negro, he by mistake kills a white person.

[2.] We are content to abide by the decision in *Henry's* case, 33 Ala. 389. Upon the principle of that decision, the accused might be convicted of the involuntary manslaughter of a white person, under a count for the voluntary manslaughter of a white person. There was, therefore, no error in the charge given by the court.

The judgment of the court below is affirmed, and its sentence must be executed, as therein ordered.—