# REPORTS

OF

# CASES ARGUED AND DETERMINED

AT THE JANUARY TERM, 1866.

## BURT *vs.* THE STATE.

[INDICTMENT AGAINST SLAVE FOR MURDER OF WHITE PERSON.]

1. *Liability of freedman to punishment for offense committed while slave.* Since the passage of the ordinance by the State convention on the 22d September, 1865, by which slavery was declared to be abolished, there has been no law in force in Alabama under which a freedman may be convicted or punished for the murder of a white person committed by him while a slave. (BYRD, J., *dissenting.*)

FROM the Circuit Court of Marengo.

Tried before the Hon. JAMES COBBS.

THE indictment in this case, which was returned into court on the 23d September, 1863, averred that the prisoner, "Burt, *alias* Burton, a slave, unlawfully, and with malice aforethought, killed Christopher Toomey, a white man, by beating him with a stick," or (as the second count charged) "by cutting and stabbing him with a knife." On the trial, which took place on the 27th September, 1865, the prisoner demurred to the indictment; but the record does not show what grounds of demurrer, if any, were specified. The court overruled the demurrer, and the prisoner then pleaded not guilty. During the trial, as appears from the bill of exceptions, several exceptions were reserved by the pris-

39

oner to the rulings of the court as to the competency of jurors, (which require no particular notice,) and also to the charge of the court to the jury, which was as follows: "If the defendant took the life of the deceased, in this county, before the finding of the indictment, with malice aforethought, or by previous agreement or concert with another person, or with the intention to rob the deceased, he is guilty of murder in the first degree, and may be punished by death, or imprisonment for life, at the discretion of the jury. You must look to all the evidence; and if satisfied of his guilt as charged, beyond reasonable doubt, will find him guilty, and say by your verdict what punishment he shall suffer." The verdict of the jury was "guilty in manner and form as charged in the indictment, to-wit, guilty of murder in the first degree, and sentence him to be hung." The court pronounced sentence of death, according to the verdict, on the 30th September, 1865, and ordered the execution to take place on the 17th November following; but the execution of the sentence was by law suspended, on account of the bill of exceptions reserved on the trial.

WM. M. BROOKS, for the prisoner.
JNO. W. A. SANFORD, Attorney-General, *contra.*

A. J. WALKER, C. J.—On the 23d September, 1863, the appellant was indicted for the murder of a white man. The indictment avers that the appellant was a slave. Section 3312 of the Code declares, that " every slave, who is guilty of murder,   *   *   *   must, on conviction, suffer death." Under this law, the appellant was, on the 27th September, 1865, tried; and, on the 30th of the same month, sentenced to be executed.

It is a principle of law which cannot now be controverted, that no conviction can be had under a law which has been repealed, or abrogated. It is also an indisputable doctrine of the law, that a conviction for crime can never be had, except in virtue of a law in force at the time when the offense was committed. From these two principles it results, that there can be no conviction of crime, except in pursuance of a law operative as to the offender at the time of

the criminal act, and also at the time of the trial. We decide, and shall endeavor to prove, that there was no law, making the act alleged in the indictment penal when it was perpetrated, which was in force when the trial was had.

The statute law, which subjected the alleged crime to capital punishment at and before the finding of the indictment, was the section of the Code above quoted. This statute was repealed, as we think, by the ordinance of the convention adopted on the 22d September, 1865, which declares, that "as the institution of slavery has been destroyed in the State of Alabama, hereafter there shall be neither slavery, nor involuntary servitude, in this State, otherwise than for the punishment of crime, whereof the party shall have been duly convicted."—Revised Constitution of Alabama, art. I, § 34.

By section 3080 of the Code, murder is divided into two degrees. Murder in the first degree is made punishable by death, or imprisonment in the penitentiary for life, at the discretion of the jury, Murder in the second degree is made punishable by imprisonment in the penitentiary, for not less than ten years. The law thus dividing murder into degrees, and subjecting guilt in the different degrees to distinct punishments, is, by an emphatic statutory declaration, made applicable to free negroes, and inapplicable to slaves.—Code, § 3305. This law, therefore, is limited in its operation to classes of persons other than slaves. A third class, composed of slaves, is specially excepted from amenability to it. This class of slaves was amenable to punishment under a section of the Code which declares, that "every slave, who is guilty of murder, * * * * must, on conviction, suffer death."—Code, § 3312.

Thus there was adopted a punitive legislation in reference to murder by slaves, variant in the character of the offense, and in the direction of the punishment, from that which pertains to all other classes. The melioration of the stern rule of the common law, by dividing murder into two degrees, and mitigating the punishment even in the most flagrant cases, at the discretion of the jury, to imprisonment in the penitentiary, and substituting in all other cases the milder punishment of the penitentiary for the death pen-

alty, is carefully restricted to the classes of free persons, and denied to the slave. This discrimination is not bottomed upon his color or race; for, if it depended upon the peculiarity of color and race, free negroes would have been placed in the same category with slaves. It grew out of the servile *status*, and has its justification, in the view of justice and humanity, in the necessity and expediency produced by that *status*. The enslaved negro could not be so well deterred from the commission of crime by the penitentiary punishment, for he was taught from infancy to regard involuntary labor as his duty, and to cheerfully submit to the immediate personal control of another. Besides, the policy of the law made it the interest of the master to throw around the slave every restraint from crime, and to defend him when charged, by providing only a partial compensation for his loss when executed, instead of making profit of his labor in the penitentiary, and giving a full recompense to his master. And it is alike creditable to the impartiality of our courts, and the wisdom of our laws, as well as to the sympathies and humanity of our slave-owners, that no class of culprits in the State have been more carefully or ably defended by counsel, or have more fully enjoyed the benefit of those wise principles which the law has appointed for the protection of innocent persons.

When the ordinance of the convention abolishing slavery was adopted on the 22d September last, there remained not a slave in the State of Alabama; and a perpetual prohibition of negro slavery in the State was ordained. The condition of slavery, upon which the discrimination above noticed was based, passed away, and the reason for it ceased. Can the law which made this discrimination continue, when the *status* on which it is founded, and which gave it birth, and afforded subjects for its operation, has passed away, and been placed under perpetual prohibition? It is certain that no offense under the statute in question could have been committed after the abolition of slavery; and if the law was not then and thereby repealed, we have the absurdity of a penal law in force, under which no offense could be committed. It can not be that, in the absence of an exception of pending cases in a repealing law, a statute

can be in force for the purpose of punishing past offenses, and yet can not reach offenses which may be committed in future. The statute in question was either repealed by the abolition of slavery, or it was not. If repealed, no conviction or punishment can be had under it, even in pending cases. If not repealed, it must still be in operation, and under it crimes subsequently committed might be punished. But this is impossible, for there are no slaves to violate it and receive punishment under it.

There are other reasons why we can not subscribe to the argument, that the section of the Code which makes all murders by slaves capital offenses, was not repealed by the abolition of slavery, but was merely shorn of its capacity to affect any subsequent crimes, for the want of slaves to commit them; and that it remains alive, to act upon crimes committed before slavery ceased. There is a practical and insuperable repugnance between the statute and the ordinance abolishing slavery; and where such repugnance exists, the prior law is repealed. The section of the Code clearly contemplates the existence of the state of slavery, not only at the time when the crime was committed, but also at the time of trial. This is indicated in the language of the statute: "*Every slave*, who commits murder, must, on conviction, suffer death." The character of slave must be present at the criminal deed, in the conviction, and in the punishment. Indeed, the main purpose of the discriminating law was the adaptation of a *punishment* to the servile condition.

Our argument becomes clearer, when we look at other statutes pertaining to the trial and punishment of slaves. Upon his trial for a capital offense, at least two-thirds of the jury must be slaveholders, and the court must assign the slave counsel, unless it is furnished by the master; and upon conviction, the value of the slave must be assessed, and the owner reimbursed one-half the amount. Any attempt to try an offender for an act done before the abolition of slavery, would encounter the difficulty, that there would be no slaveholders to make up the jury, no master to employ counsel, and recover one-half the assessed value; and there would be no slave to try, for it is obvious that the statute

contemplates the existence of the state of slavery at the trial. Unquestionably, the character of slave is a constituent of the crime, without an averment of which the indictment would be defective. The statutory crime could not exist without the presence of this element. This element of the crime was certainly destroyed by the abolition of slavery. To convict one afterwards, would be to punish for crime, an indispensable element of which had no existence, save in the recollection of the past.

We have been led to discuss this question at so much length, more by its novelty and general interest, than by its intrinsic difficulty. We are of the opinion, that the statute providing for the punishment of *slaves*, as a distinct class, for murder, was repealed by the ordinance of the convention.

In giving this case a thorough examination, we next encounter the question, whether the accused was not liable to be punished under the common law for the crime committed. This question we decide in the negative. We think the common law, so far as it would have affected the prisoner, was abrogated by the statute.—Code, § 3312. The punishment may be the same under the statute, as at common law; but the offense, in this State, is not identical with murder at common law. An ingredient enters into the offense here, which was unknown at common law; that is, the fact that the offender was a slave. Even if slavery existed at the common law, it certainly knew nothing of the crime of murder by a *slave*, as distinct from all other homicides by all other persons, and subject to distinct punishment. An indictment at common law, for the crime of murder by a slave, would be bad; and no conviction for the offense here could be had under such an indictment. The Code provides, that indictments for offenses designated in the Code, " *which are offenses at common law,*" are good, "if the offense is charged or described according to the common law; and the defendant, on conviction, must receive the punishment prescribed by the Code."—Code, § 3504. Under this section, common-law indictments are allowed, where the offense was an offense at common law.

The prosecution here is not for an offense at common law, and the section of the Code can have no application.

To test the question whether a common-law indictment would have been good in this case, let us inquire how, upon such an indictment, the court could decide what judgment to render. The *status* of the slave defendant not being alleged, the presumption would be that the accused was a free person. Murder by a *slave* is an exceptional case ; and this being so, it would not be presumed that the accused was a slave, and it has been so ruled in reference to an analogous question in Georgia and Virginia.—*John v. State*, 16 Ga. 200 ; *Commonwealth v. Bennett*, 2 Virginia Cas. 235. Therefore, the court would be led by an indictment not showing that the prisoner was a slave, to conclude the punishment to be due according to the general statute, which divides murder into degrees. It is a general rule, to which peculiar statutes may make exceptions, that the court should be able to determine from the indictment what judgment to pronounce.—1 Chitty's Cr. Law, 227 ; Barbour's Cr. Law, 332. And the same rule is adopted, substantially, by statute in this State.—Code, § 3515. This court, in the case of *Nelson v. State*, (6 Ala. 394,) pronounced an indictment of a slave "incurably defective," which charged an intent to kill "Stephen G. Williams," because it did not allege that Stephen G. Williams was a "white man." This decision was put upon the ground, that the court could not tell, except from argumentative inference, what was the proper punishment under the indictment. So, also, in the case of *The State v. Moses*, (Minor, 394,) an indictment was held to be bad on a similar objection.

The entire common law on the subject of murder has been revised in this State. The general statute in reference to murder *by white persons and free*, and the special statute in reference to the same offense by slaves, cover every conceivable case of murder. Construed in *pari materia*, and taken together, they cover the entire ground of the common law. The statute in reference to slaves stands as an exception to the general law. The general and exceptive statutes thus covering the entire subject of the former law, it would, according to many authorities, stand repealed.—Smith on Statutes, §§ 786,

787; *State v. Whitworth*, 8 Porter, 434; *Smith v. State*, 1 Stew. 506. But, as Bishop, in his most excellent work on Criminal Law, doubts the correctness of the doctrine, although citing many decisions in support of it, we will not put our ruling upon that ground.—1 Bishop on Cr. Law, § 92. It is sufficient for our argument, that no such offense as murder by a slave, in contradistinction to free persons, and subjected to a distinct punishment on account of the *status* of the slave, was known at the common law.

Under our criminal system which preceded the Code, and which was not materially different, the court did not stop at ruling that the averment that the accused was a slave must be made, but held that the name of the owner of the slave must be stated.—*Phereby v. State*, 16 Ala. 774; *Flora v. State*, 4 Porter, 111. And such would now, upon precedent, be a law of the State, had not the Code dispensed with the averment of the name of the owner.

But, even if the offense committed by the prisoner had been punishable at the common law, the defendant could not, in our opinion, have been convicted under it; for we think that such common law would have been abrogated by the ordinance of the convention abolishing slavery. The general statute on the subject of murder applied, as has already been seen, to free negroes. On the 22d September last, by the ordinance of the convention, all the slaves became free. No refinement of logic, or subtlety of argument, can assign to the negroes emancipated by the convention a different attitude in reference to the penal laws of Alabama from that of the negroes who were before free. In the instant of their emancipation they were *free negroes*, and, being free negroes, became indictable and punishable for offenses afterwards committed under the general law on the subject of murder. This general statute, therefore, after the abolition of slavery, embraced all the people of the State, of every color. This statute was repugnant to the common law, alike in the division of murder into degrees, in its direction as to punishment, and in its allowance of discretion to the jury in fixing the punishment. The common law was, therefore, if before in force as to the prisoner, abrogated by his coming under the operation of the general

statutory provision. Being thus abrogated, there could be
no conviction under it; for the principle that there can be
no conviction under a law repealed, embraces the common,
as well as the statute law.  It is no objection to this con-
clusion, even if it be true that an indictment might be
framed under the common law; for we often go to the com-
mon law for forms of indictments, when as to its punishment
it has been abrogated.

The prisoner was not, however, sentenced to punishment
under the common law; and the judgment could not be
sustained upon the authority of the common law.  The
sentence was under section 3080 of the Code, the general
statute of murder ;  and we must inquire, whether the de-
fendant was amenable to punishment under that statute.
The argument which led to the sentence under section 3080,
notwithstanding the indictment was under section 3312, we
suppose was this : that, as the former section prescribes a
milder punishment than the latter, becoming amenable to
the former by his emancipation, he could be punished un-
der it, notwithstanding he was indicted under the latter,
and only liable under it when the offense was committed.
There are decisions asserting that, if a subsequent statute
mitigates the punishment prescribed for the same offense
in an older one, the mitigated punishment may be inflicted
for a crime committed before the adoption of the later
statute.—1 Bishop on Cr. Law, § 108, and authorities there
cited.  But, if that doctrine be correct, it does not apply
here.  The general statute of murder does not aim to pun-
ish the same offense with the statute in reference to slaves.
The latter statute makes the offense, when the element of
slavery in the accused is present, an offense different in its
punishment and its constitutents, from that which is em-
braced in the general statute, section 3080.  Therefore, it
cannot be correctly said that the slave defendant here,
when emancipated, became amenable to a statute prescrib-
ing a milder punishment for the *identical* offense with which
he is charged.

Besides, it is distinctly declared in the Code, that section
3080 shall not apply to slaves (Code, § 3305); and section
3080 must be read as if there were incorporated in it an

express exception of slaves. This statute "was not promulgated," as to the accused, within the meaning of the bill of rights, prior to the offense. The operation of it upon the acused, as he stood when he did the criminal act, was *prohibited*; and his subsequent emancipation could not remove the prohibition.

Finally, we think there is no law under which the accused can be punished. For this state of the law we are not responsible. We are to expound, and not to make laws. As there is no law under which the accused can be punished, it is useless to remand the case. Judgment must, therefore, be rendered, reversing the judgment of the court below, and ordering that the sentence be not executed upon the prisoner, and that he be discharged from custody under the indictment in this case.

We have spoken of the abolition of slavery as effected by the ordinance of the convention, because, as the trial occurred after the passage of the ordinance, it was not necessary to inquire whether slavery was not sooner destroyed. Upon this latter question, it is not intended to commit the judges who assent to this opinion. Their respective views on that subject will appear in another case.

JUDGE, J.—It has been decided at the present term of this court, that all the penal statutes of the State, applicable to slaves as a class, have been abrogated by the destruction of slavery; they being repugnant to, and in contravention of, the genius and policy of the State, as declared by its fundamental law.—*George v. The State,* at the present term.

It has also been decided at the present term, that on the abolition of slavery and the abrogation of the slave code, the general criminal statutes of the State became applicable to the class known as freedmen.—*Eliza v. The State,* at the present term.

Among the penal statutes which have thus become applicable, are sections 3080, 3081, and 3082 of the Code, which divide the offense of murder into two degrees, first and second, and provide imprisonment in the penitentiary not less than ten years, for murder in the second degree, and

Burt (a freedman) v. The State.

the death penalty, or imprisonment for life in the peniten-
tiary, for murder in the first degree, at the discretion of the
jury trying the case.

These provisions of the Code, relating to murder, apply
to all classes of persons in the State; and every person
guilty of that offense, must be tried, convicted, and pun-
ished, if at all, under these sections of the Code. They
change, and completely supersede, the common-law punish-
ment for murder, leaving no ground whatever on which the
common-law punishment for that offense can stand; conse-
quently, the common-law punishment for murder is not in
force in this State.

Then, if this cause should be reversed and remanded for
another trial, under what law could the prisoner Burt be
tried, and, if convicted, punished? Not under the provisions
of the Code, above named, for they were not in force, as to
him, when the offense was committed; and to punish him
under a law not applicable to his case, when the offense was
committed, would be to punish him under an *ex-post-facto*
law, in the teeth of the constitution of the United States,
and in violation of the 8th section of the bill of rights of
this State, which declares, that "no person shall be punished,
but in virtue of a law established and promulgated *prior
to the offense.*" And he could not be tried and punished as
at the common law, for, as before stated, the punishment for
murder as at the common law is not in force in this State.
Under what law, then, I repeat, could he be tried and pun-
ished? I answer, legally under none. The law in force when
the offense was committed; providing for his punishment,
having been abrogated, with no saving proviso as to offenses
committed while it was in force, under a principle coeval
with the law itself, and one that has never been controverted,
all such offenses go with the law. The question is precisely
the same, as if the legislature had repealed the law appli-
cable when the offense was committed, without a saving
clause as to offenses committed prior to the repeal; and
had enacted subsequent to the commission of the offense,
the provisions of the Code, applicable to murder and its
punishment. If this had been done, would not the offense
have been cured?

It is to be regretted that, in cases like the present, offenders escape merited punishment. But, if such be the law, courts cannot help it—they must expound the law as it is. The discharge of the prisoner is one of the evils resulting from the war, and is not by any means the greatest that has been brought about by that calamity. Having no power in the premises, other than to declare what I believe to be the law, I am constrained to concur in the opinion delivered by the chief-justice.

BYRD, J.—The indictment describes the prisoner as a slave, and the person slain as a white man. It was found under section 3312 of the Code, which, for the purposes of this opinion, may be read as follows: "Every slave, who is guilty of murder, must, on conviction, suffer death."—20 Ala. 15; 38 Ala. 213.

The indictment is in substantial conformity to the forms given in the Code, and the rules prescribed in chapter 7, title 2, part 4, thereof. The Code does not furnish any form for an indictment *against a slave*. The indictment is statutory, and sufficient; and the court did not err in overruling the demurrer.—*Noles v. The State*, 24 Ala 672.

At the trial, the prisoner was a freeman; (*Smith v. The State*, and *Jeffreys v. The State*, at the present term ;) and therefore, the exception to the ruling of the court, as to the qualification of the jurors, was not well taken; if *then* a slave, it would have been. This right, as well as the right of the owner to have the value of a slave assessed on conviction of a capital offense, are matters pertaining to the remedy, and not to the offense ; and therefore may be repealed, and a new remedy provided, without affecting the conviction of an offender who had committed a crime.—*Love v. The State*, 4 Ala. 173.

The important question to the prisoner, and to the vindication of public justice, is, whether he has committed any offense for which he can now be punished. This question was decided in the negative, in the case of *George v. The State*, at the present term ; in which case, I was at one time of counsel for the prisoner, and therefore did not sit

on the hearing; and I now proceed to give my opinion on the main question presented in this case.

I have striven diligently to find some adjudicated case, or sound and well-established principles, which would authorize me to concur in opinion with my brethren, and have been unable to do so. Of this I was the more desirous, from a sense of the importance of unanimity on so grave a question.

The prisoner was a slave; he is now free. While a slave, by the finding of the jury he committed murder, in killing a white man; and this, by our law, is no higher offense in a slave, than the murder by him of a free person of color, an Indian, or *a slave*. In this respect, our Code makes no distinction; (*Isham v. The State*, 38 Ala. 213;) *nor did the common law*. Murder is a crime against the individual and the public.—1 Bish. C. L. §§ 387, and 408. "Murder is an act committed from what the law deems a depraved mind bent fully on evil, the result of which is the death of a human being within a year and a day from the time of its commission."—2 Bish. C. L. 652. The only exceptions, as to persons capable of committing the offense, are idiots, lunatics, and infants—*a slave* is no where 'excepted.—1 Hawk. P. C. 1; 4 Black. 195-6. Our criminal laws, though Burt was a slave, treated him as a person, and a responsible human being, as to crimes committed by him; and so did the common law.

When hereafter the phrase *"the common law"* is used in this opinion, it will include both the ancient common law of England and the common law of this country, unless restrictive terms are used in connection therewith.

The first branch of the argument will embrace these propositions: 1. Slavery is recognized by the common law as a legal institution. I am aware that Lord Mansfield, and some other distinguished jurists, have said that slavery was unknown to the ancient common law; and so have some persons, more or less distinguished, said that slavery was not sanctioned by the theocratic institutions of the Jews, as set forth in the Pentateuch, nor recognized by Christ and his Apostles in the New Testament scriptures.—Lev. ch. 25, vs. 45, 46; Ex. ch. 21; 1 Tim. ch. 6; Paul Ep. to

Philemon. But, fortunately, such statements, made upon any authority, however distinguished or worthy of our respect and consideration, cannot outweigh or obliterate the stern lessons of history, or the incontrovertible and recorded facts of the past. Slavery was established on this continent under British auspices and the ancient common law, and has been so recognized for more than two centuries. If slavery did not exist among the Britons prior to the occupation by the Romans, it is more than probable that the institution was established by the conquerors; for Rome carried her laws and institutions wherever she occupied.—Cobb on Slavery, CXXII, ch. 8. But, however this may be, it is stated that the Germans, which term included Saxons, held slaves. "The leaders and their military companions were maintained by the labor of their slaves"; (Hume, ch. 1, p. 4;) and the Saxons, with the aid of the Angles, conquered the Britons about the year 550, and thus established their laws and institutions in England; and hence the derivation of the term Anglo-Saxon. Over three hundred years after, we find it to be one of the regulations of the laws of Alfred the Great, that "a slave may fight in his master's quarrel"; (Hume, p. 46;) and this regulation is good common law to this day. It is said that he framed a body of laws which are now lost, and "served long as the basis of English jurisprudence, and is generally deemed the origin of what is denominated *the common law*." Hume, p. 21. And so we trace slavery to the very fountain and origin of the common law.

Upon the conquest by the Angles and Saxons, " the native inhabitants who remained in England, were reduced to the most abject slavery."—Encyclopædia Britannica, (Edinb. ed. 1810,) vol. 8, p. 56.

" By a statute of Alfred the Great, the purchase of a man, horse, or an ox, without a voucher to warrant the sale, was strictly forbidden. That law was, doubtless, enacted to prevent the stealing of men and cattle. But it shows that, at so late a date as the 9th or 10th century, a man, when fairly purchased, was in England as much the property of the buyer, as the horse on which he rode, or the ox which dragged his plow. In the same country, now so nobly

tenacious of freedom and the rights of man, a species of slavery similar to that which prevailed among the ancient Germans subsisted, even to the end of the 16th century. This appears from a commission issued by Queen Elizabeth, in 1574, for inquiring into the lands and goods of all her *bondmen* and *bondwomen* in the counties of Cornwall, Devon, Somerset, and Gloucester, in order to compound with them for manumission, that they might enjoy their lands and goods *as freemen*."—Encyclopædia Britannica, (Edin. ed.) vol. 19, title Slavery, p. 390.

The *status* of slavery was recognized by the Anglo-Saxons, as well as that of freemen. " The lower rank of freemen were denominated Ceorles." " But the most numerous rank by far in the community seems to have been the slaves or villeins, who were the property of their lords; and were consequently incapable themselves of possessing any property."—Hume, p. 45. On the same page Hume says : "There were two kinds of slaves among the Anglo-Saxons : household slaves, after the manner of the ancients ; and prædial, or rustic, after the manner of the Germans.     *     *     * The power of the master over his slaves was not unlimited among the Anglo-Saxons, as it was among their ancestors. If a man beat out his slave's eye or teeth, the slave recovered his liberty ; if he killed him, he paid a fine to the king, provided the slave died within a day after the wound or blow ; otherwise, it was unpunished. The selling themselves or children to slavery was always the practice among the German nations, and was continued by the Anglo-Saxons." To sustain these facts, Hume refers to Spelman's Gloss., *in verbo "servus*," Leges Alf. §§ 12, 17, and 20 ; Tacitus De Mor. Germ.; Leges Inæ, § 11. These authorities are not at my command ; but, from the acknowledged research, and general accuracy of that learned historian, I have no doubt they fully sustain the text. He says, that the power of the master over the slave was not unlimited among the Anglo-Saxons, as it was among their ancestors. This amelioration was, no doubt, produced by the humane principles of the common law and the Christian religion; and these, with other causes, still farther mitigated the condition of the slaves, until in the reign of John, in the year 1215,

*Magna Charta* was granted, by which it was provided, that "every freeman shall be fined in proportion to his fault; and no fine shall be levied on him to his utter ruin ; even a villein or rustic shall not, by any fine, be bereaved of his carts, plows, and implements of husbandry." This was the only article calculated for the interests of this body of men, probably at that time the most numerous in the kingdom. Hume, ch. XI, p. 117. Here we see the *freeman* distinguished from the *villein;* and that the word *slave,* which is of *Sclavonic* derivation, had been softened to that of *villein* or *rustic,* during the years which intervened between the final conquest of England by the Anglo-Saxons, (about the year 550,) and the year 1215. And we observe the further mitigation of the condition of the slave, as to his right to own property ; at least, implements of husbandry. And, finally, under the combined influence of the common law and Christianity, slavery almost entirely disappeared amid the "wars of the Roses." Those contests also aided to extinguish the distinct badges of slave servitude in Great Britain, though maintained in her colonies long since. But, because there are now no such persons as slaves in England for the common law to act on, is no argument against the position, that the common law recognized slavery, and was applicable to it, as long as, and wherever it existed. The great merit of the common law is, that its maxims and principles are so comprehensive, expansive, and accommodating, that they can be appropriated to the solution of every problem, however novel or intricate, which may arise in the affairs or transactions of mankind, if uncontrolled by legislative or constitutional enactments. As a system of law and jurisprudence, it has been forming, improving, and maturing, for ages ; from a time "whereof the memory of man runneth not to the contrary"; and is now held in the highest appreciation and reverence by the learning and wisdom of the civilized world.

It is, then, probable that, from the invasion of Cæsar, about fifty years before the birth of our Savior, to the year 1574, (more than sixteen hundred years,) slavery existed in some form in England ; and that it certainly did so exist about seven hundred years, and three hundred more than

Burt (a freedman) v. The State.

it has on this continent, under British laws. And upon examination it will be found, that Lingard, Hallam, Camden's Britannia, Glanvil, Spelman, Bracton, and other lights of the common law and history, are not in conflict, and the most of them are in harmony with Hume. (The edition of Hume from which the above extracts are taken, is Baudry's Paris edition of 1837, containing Hume, Smollett, and Hughes, twenty-one vols. in one.)

In the case of *Pearne v. Leslie*, (Amb. R. 76,) Lord Hardwicke, C., said : "As to the nature of the demand, it is for the use of negroes. A man may hire the servant of another, whether he be a slave or not, and will be bound to satisfy the master for the use of him. I have no doubt that trover will lie for a negro slave; it is as much property *as any other thing*. The case in Salk. 666, was determined on the want of proper description. It was trover *pro suo Æthiope, vocat. negro*, without saying slave : and the being negro, did not necessarily imply slave. The reason, said at the bar to have been given by Lord Chief Justice Holt in that case, as the cause of doubt, viz., that the moment a slave sets foot in England he becomes free, has no weight with it; nor can any reason be found, why they should not be equally so when they set foot in *Jamaica*, or any other English plantation. All our colonies are subjects of England, although as to some purposes they have laws of their own. There was once a doubt, whether, if they were *christened*, they would not become free by that act; and there were precautions taken in the colonies to prevent their being *baptized;* till the opinion of Lord Talbot and myself, then attorney-general and solicitor-general, was taken on that point. We both were of opinion, that it did not at all alter their state. There were formerly villeins or slaves in England, and those of two sorts, regardant and in gross : and although tenures are taken away, there are no laws that have destroyed servitude absolutely. Trover might have been brought for a villein." This was in 1749 ; but, as early as the reign of Charles the Second, it was decided, in a suit for two hundred slaves, in the case of *Butt v. Penny*, (2 Lev. 201,) that the plaintiff was entitled to recover in an action of trover for the slaves.

40

In the case of *Madraza v. Willes*, (3 Barn. & Ald. 353, and 5 Serg. & Low. 313,) which was a suit by plaintiff, a subject of the kingdom of Spain, against the defendant, a subject of Great Britain, to recover the value of three hundred slaves, which the defendant had on the high seas seized and converted to his own use, it was decided, that the plaintiff was entitled to recover. At *nisi prius*, "it occurred to the lord chief-justice, that the plaintiff was not entitled to recover, in an English court of justice, for the slaves, and directed the jury to find a verdict separately for each part of the damage." And the cause coming up at the court of common pleas, Abbot, C. J., said : "Considering the very extensive language used in the two acts of parliament, to which we have been referred, I had at first thought that it was not competent, even for a foreigner, to come into an English court of justice, and there to recover damages for a loss sustained by him in the prosecution of a trade declared by the British legislature in such strong language to be unlawful." And he held, that the plaintiff was entitled to recover the value of the slaves. Bayley, J., in the same case, said : "The plaintiff has a *legal property* in the slaves, of which he has, by the defendant's act, been deprived". And Holroyd, J., said : "However much I may regret that any damages can be recoverable for such a subject as this, yet I think we are bound to say that the plaintiff is entitled to them." Best, J., said : "But it is impossible to say that the slave trade is contrary to what may be called the *common law of nations*. It was, until lately, carried on by all the nations of Europe." This was in 1820. If slavery was not recognized by the common law, and was against the policy of Great Britain, upon what principles were her courts bound to enforce a claim against her fundamental law and policy?

In 1817, that distinguished jurist, Lord Stowell, in the case of *Le Louis*, (2 Dod. Ad. R. 249; 1 Phil. In. Law, 253,) held, "that *trading in slaves* was neither piracy, nor *legally* criminal. * * It was sanctioned by ancient admitted practice, by the general tenor of the laws and ordinances, and by the formal transactions of civilized states, and by the doctrine of the courts of the law of nations." In com-

menting on this opinion of Lord Stowell, Mr. Phillimore says : "All this is undoubtedly true." Since that time, it is admitted that the slave trade has been held illegal. But Mr. Phillimore says (section CCCVII, p. 251): "If Great Britain was deeply dyed by her *Assiento* contract and her colonial slavery, in this accursed commerce, her worst enemies must admit that she has, since the beginning of this century, been indefatigable in her efforts to wipe away the stain." "The first British statute that declared the slave trade unlawful, was in March, 1807."—1 Kent's Com. 195.

In the case of *The Antelope*, the supreme court (10 Wheat. 66) of the United States held, "that the slave trade had been sanctioned in modern times by the laws of all nations who possessed distant colonies, and a trade could not be considered as contrary to the law of nations, which had been authorized and protected by the *usages* and laws of all commercial nations."

*Slavery* being thus sanctioned by the institutions of the Jewish theocracy, by the New Testament Scriptures, by the ancient and modern common law, by the adjudications of the wisest British and American jurists, and by the usages and laws of all civilized nations, the people of the South have felt justified in their toleration of the institution of African slavery, and secure in their title to such slaves, even if the constitution of the United States had given no validity to their rights in the premises.

The foregoing views and adjudications are in harmony with the opinion in the case of *Atwood's Heirs v. Beck*, (21 Ala. 590,) in which Chilton, C. J., delivering the opinion, in speaking of the existence of slavery in England at one time, says : "Be that as it may, it is *most* unquestionably true, that slaves are now regarded by our law as chattels, and the owners thereof have an absolute, unqualified property in them ; and although such right might not have been recognized by the ancient common law, yet, such is the genius and expansive nature of the common law, that it adapts itself to the necessities and exigencies of society; and when a new species of property is introduced, and the statute law is silent as to the rules by which it is to be governed, the common law embraces it, and its rules are ap-

plied to it, modified, of course, according to the nature of
the property thus subjected to its government." He says
further: "In considering the rules which apply to and reg-
ulate this peculiar species of property, we must look upon
them in the double capacity of chattels and intelligent be-
ings." This case was re-affirmed in 27 Ala. 490, and in
35 Ala. 12.

In the case of *Fisher's Negroes v. Elder*, (6 Yerger, 157,)
Catron, C. J., says : " By the common law, a master might
manumit his slave at pleasure." How could a master manu-
mit his slave at common law, if the master's right to the
slave was not recognized by that law. If, as Chilton, C. J.,
says, they are treated by our laws as "intelligent beings,"
as they were also by the common law, they are certainly
responsible for crimes committed by them, not *as* slaves,
but *as* intelligent human beings.

In *Jones v. The State*, (5 Ala. 670, 679,) this court says :
" These sections" (of the statute) " treat of the crime of
murder committed on a slave. They do not create a mere
offense unknown to the common law, nor do they subject
the offender to a greater punishment than was inflicted at
common law ; they are therefore not statute offenses."

If the murder of a slave was an offense known to the
common law, that law must have recognized the *status* of
the slave, and as a human being ; and, therefore, in the case
of *Jones*, the court very accurately say, that " the statute
against the murder of a slave does not create an offense
unknown to the common law ;" and the court, with equal
accuracy, could have said, that the statute against a slave
for the murder of any human being did not create an of-
fense unknown to the common law, and is not therefore a
statutory offense. It would be singularly inaccurate to
hold that the unlawful killing of a slave by any one was an
offense at common law, but that the unlawful killing of any
one *by a slave* was not also an offense at common law;
which *made no distinction between a free person and a slave
as to the offense and punishment of murder.*

I have thus, at some length, discussed this subject, as it
has been held, and even by this court intimated, that slavery
was unknown to the common law, and therefore never ex-

isted in England. I have shown that, there, a slave was treated as property, and as a person, and that our laws treat him likewise; and this similarity is sufficient for the purpose of this argument, without showing in what else the two systems of slavery are alike or dissimilar.—5 Cow. 397; 9 Head, 120.

II. From the foregoing it results, that *"the killing of a human being by a slave with malice aforethought was by the common law murder." And that law is in force in this State.*

As far back as the case of *Cawood v. The State*, (2 Stew. 364,) this court held, that the "common law of England was in force in this country, so far as compatible with the genius of our institutions." In the case of *Barlow v. Lambert*, (28 Ala. 707,) it is said the doctrine has been firmly established, that "the common law of England, so far as applicable, was made a rule of action for our government, both in civil and criminal cases."—See 6 Ala. 637; 19 *ib.* 829.

In England, slaves were punishable for crime by the common law, and crimes against them were also punishable. Cobb on Slavery (ch. viii, p. 122) very fully and ably treats the subject of British slavery, and the principles of law applicable to the institution and the slave. Wharton, in his excellent work on the American Law of Homicide, says: "If a slave kill his master whilst the latter is correcting him, it is murder at common law; and those present aiding and abetting are guilty of the same offense." The principles of the common law, which made it murder in a slave to kill his master while correcting him, would certainly make it murder in a slave to kill any human being with malice aforethought. Sections 3316 and 3317 of the Code are persuasive to show that the legislature considered slaves capable of committing common-law offenses. The case of *Nelson (a slave) v. The State* (6 Ala. 396) impliedly holds the same doctrine. In the case of *Jones v. The State*, *supra*, this court held that a common-law indictment against a white man for the murder of a slave is good. The same rule is applicable to a slave. Upon this question the authorities are clear and luminous.—Whart. C. L., § 1043; *State v. Crank*, 2 Bailey, 66, *full in point*; *State v. Cæsar*, 9 Ired. (N. C.) 391. In the case of *The State v. Will (a*

*slave)*, which was a case of murder of a white man by a slave, Judge Gaston, in delivering the opinion of the court, after the cause had been argued at great length, and with remarkable learning and ability, says (1 Dev. & Bat. 165): "that the crime charged is that of murder *at common law.* By that law, murder is described to be where a person of sound mind and discretion killeth any reasonable creature in being with malice aforethought; and the inquiry in this case is, whether upon the facts found the law adjudges that the killing was committed with malice aforethought. If so, it adjudges then the prisoner was rightfully convicted of murder."—*Jacob v. The State,* 3 Haw. (Tenn.) 513; *Nelson v. The State,* 10 *ib.* 519; *Ann v. The State, ib.* 163.

At common law, if a servant murdered his master, it was petty treason; but he could be indicted for that offense, or for murder. The first involved the *status* of the offender, the second did not; *it is the same in all human beings.*

In *Oxford v. The State,* (33 Ala. 418,) this court says, that it "recognizes his" (the slave's) "existence as a person, his capacity for crime, and his subjection to criminal responsibility." In *Hudson v. The State,* (34 Ala. 253,) this court say that "we hold that when a slave is unlawfully deprived of life, he is under our laws a reasonable creature in being. Either a white person or a slave may commit the crime of murder and manslaughter." In this respect, neither the Code nor the common law made any distinction, except in the murder of the master by the servant, which we have seen was petty treason, though he could be indicted and convicted of murder. If murder in section 3312 of the Code means anything, it means murder as defined at common law.—4 Por. 397.

III. By the common law, *death is the punishment inflicted for the crime of murder,* (4 Black. Com. 195–6,) *and such was the penalty for murder committed by the prisoner at the time of its commission in this case.*

IV. *The punishment by section 3312 for murder was death, at the time of the murder of Christopher Toomey by Burt, the prisoner; and so it was at common law.*

V. *The ingredients of the crime of murder were not changed by the Code,* (4 Por. 397; Code, §§ 3312, 3080, 3081;) *the last*

*two sections only distinguish it into two degrees, and punish each degree according to its enormity.* If murder means any- thing in section 3312 of the Code, *it means* murder as defined by the common law, (2 Bish. C. L. § 652; 4 Black. Com. 194,) and there is no difference as to the ingredients of the crime at common law and by section 3312 of the Code. In the case of *Isham v. The State,* (38 Ala. 283,) the Chief Justice, in delivering the opinion of the court, says, that " the statute does not make a knowledge that the deceased was a white person an ingredient of the offense, and we cannot decide that it is." Nor did the common law make it an ingredient. And he further says, that " a homicide by a slave, which would constitute murder, would be the same offense, and subject to the same punishment, whether the deceased was a white person or a slave." *And so it was at common law.* And the offense and the punishment being the same by the Code and at common law, then, in the language of the court in the case of *Jones v. The State,* (5 Ala.; 4 Por. 397,) it is not " a statute offense." This case is very clear to the point; and it cannot therefore be main- tained that the *status* of a slave enters into the crime or the punishment as an ingredient of either, at common law or by the Code. And therefore the law of this case stands as though section 3312 had never been adopted, and the prisoner had been left as to the crime of murder to be tried and punished as at common law. By our Code, slaves, as to the crime of murder, and its punishment, were left as at common law, with no change whatever.

VI. *The crime and the punishment being the same by the Code, at the time of the commission of the offense by the pris- oner, as they were at common law, the destruction of the insti- tution of slavery, thereby setting the prisoner free from servi- tude after the commission of the offense and before trial, does not operate as a pardon, or discharge him from statutory punishment.* On this proposition there is no direct au- thority in point from adjudged cases, for or against it. But, on reason, of which the common law is said to be the perfection, it is against common right and justice, that an act which confers a higher *status* and greater rights upon a class of persons, should exonerate them from the conse-

quences of an offense at common law; and, especially, from an offense which was punishable with death by the statute and by the common law. In what just sense can the statutory punishment be said to be repealed? There is no express repeal by the State convention of 1865; but the repeal is sought to be implied from the fact that the convention recognized the destruction of slavery in the State, and prohibited its existence. Such a repeal, which results in turning murderers free from punishment, and thereby defeating the ends of good government and public justice, should never be implied, unless the intention of the convention was clear and unmistakable. Not being so, and there being no adjudged case, or principle of law in point, the statute should not be held to be repealed as to the offense or punishment; for, although the statute says, "every slave who commits murder must, on conviction, suffer death," the word *slave* is used to describe a class of persons, and not to aggravate the offense or punishment, for both are the same as at common law; for the *status* is not of the essence, or substance, of either.

On the doctrine of implied repeals of statutes or common law, the following authorities are in point: 6 Sm. & Mar. 628; *Kinney v. Mallory*, 3 Ala. 62; 33 Ala. R. 693, in point; 1 Wis. R. 436; 3 *ib.* 109, 667; 1 Bish. Crim. Law, from § 90 to § 108, and cases therein cited.

VII. But, even if the destruction of the institution of slavery operated a repeal of section 3312 of the Code, *it did not thereby exonerate the prisoner from a crime known to the common law, and committed before he became free, or from the punishment denounced by the common law, where the offense and the punishment were the same by the statute in force at the time the offense was committed and by the common law.*

The common law underlies, and is the foundation of, the constitutional, legislative, judicial, and political systems of this country, and is their *chief* merit and support. If a statute enacted a new penalty for a common-law offense, the party who committed the offense could be proceeded against, either under the statute, or at common law.— 6 Dane's Abr. 586; 2 Bur. 805; 2 Salk. 460; 2 Hawk. P. C. 251; 9 Bac. Abr. 235; 1 Bish. C. L. § 93; 5 John. 175; 2 Bibb, 80, 96.

Burt (a freedman) v. The State.

This court has recognized that such a rule existed at common law, and so it is by section 3504 of the Code; but it limits the court to the infliction of the punishment prescribed in the Code, and, that far, changed the rule at common law. But, if the offense and punishment were the same by the common law as by the Code, then, if the statute is repealed, the common-law punishment can be inflicted, and the rule of the Code is not applicable, upon the maxim, *cessante ratione legis, cessat ipsa lex.—People v. Enoch,* 13 Wend. 159, *in point.* The offense and punishment being the same by statute as at common law, the statute does not repeal the common law.—13 Wend. 159 ; 5 Com. Dig. 330; 1 Hale's P. C. 705, § 16 ; 4 Haw. P. C. 4, and note on p. 5 ; 3 Hill, 38 ; 13 Serg. & R. 326 ; Wharton's C. L. §§ 372–3 ; *Sir John Knight's case,* 3 Mod. 117, *to the point ;* 2 Hale, 191.

In Viner's Abridgment, (vol. 19, p. 494,) it is laid down, that "a statute, which is made only in affirmance of the common law—that is, does not enact any new thing, but does only enact that which was provided for by the common law before the act, *though it did not so plainly appear*— is, nevertheless, a statute, and may be pleaded as a statute, although the defendant has a plea at the common law also. For it enacts nothing contrary to the common law, and may well stand with it."

Mr. Bishop says : "For some time a statutory provision, and a provision of common law, like two statutory ones, may stand together up to a given point, and beyond that *may* come into conflict. In such a case, the prior law is not repealed."—Bishop's C. L. § 80, and cases there cited. This provision is in harmony with that provision of the constitution, which requires a law to be "established and promulgated prior to the offense;" for the common law is always established and promulgated, where the statute is declaratory, or in affirmance, of the common law. And conceding that the statute has been repealed as to the punishment and the offense, yet, the common law, being the same, *stands,* and is unaffected by the repeal of the statute, and is in force as to all offenders who have committed crimes which were offenses at common law, and where the punishment is the same by both.—*The King v. Carlisle,*

3 Bar. & Ald. 161, *to the point; State v. Rollins*, 8 N. H. 550;
2 Met. (Ky.) 399, *a case in its argument quite in point.*

It has never been held that the repeal of a statute op-
erated a repeal of the common law; on the other hand, the
repeal of a statute revives, or puts in force, the common
law, as to the matters upon which the repealed statute
operated a suspension or abrogation. Neither the adoption
of a statute in affirmance of the common law, nor the repeal
of such a statute, in any manner affects, repeals, or modifies
the common law. It stands independent of the statute or
its repeal.—1 Bish. C. L. § 109; 1 Kent, 466; 5 Cow. 165,
*Crittenden v. Wilson;* 7 Cowen, 536–7; 4 Hill, N. Y. 100;
13 Wendell, 159. A common-law indictment will authorize
a conviction under a statute, where the offense and punish-
ment are the same by statute and common law. And this
rule is recognized by this court.—5 Ala. 477; 4 Porter, 397;
also, *Mitchell v. State*, 5 Yerger, 340; 13 Wendell, 159. Sec-
tion 3305 of the Code prohibits the infliction of punish-
ments provided by the Code for free persons, unless so pre-
scribed by the Code; and under that regulation, peniten-
tiary punishment could not have been inflicted on the pris-
oner at the time he committed the offense; but the punish-
ment of death, for murder in the first degree, as provided
by section 3080 of the Code, is the same, that far, as pre-
scribed by section 3312, which applied to the prisoner when
he committed this offense.

Mr. Bishop says (Cr. Law, § 107): "It seems to be held,
that if a statute is passed establishing a new punishment
for what still remains criminal at common law, and during
the continuance of this statute an offense is committed, and
afterwards the statute is repealed, and a new punishment
ordained for the future, the old offense may be subjected to
the common-law punishment. It is not easy to see how
this can be, unless we suppose, contrary to the doctrine laid
down a few sections back, the statute was merely cumula-
tive, leaving the common-law punishment, as well as offense,
to remain."—See, also, *Rex v. McKenzie*, Russ. & Ry. 429;
*People v. Townsey*, 5 Denio, 70; *Roberts v. The State*, 2 Over-
ton, 423.

Section 3312 of the Code is not cumulative. It is strictly

declaratory, or in affirmance of the common law; and *a fortiori*, the common-law punishment can be inflicted, where the statute is repealed after the offense, *where*, as in this case, the crime and its punishment are the same by the statute as at common law, (13 Wend. *supra*,) and in this, I have no doubt Mr. Bishop concurs.

Where the statute creates a new offense, or aggravates a misdemeanor to a felony, and prescribes no penalty, the common-law punishment for crimes of the same grade will be inflicted.—Cobb on Slavery, § 100, p. 95; *Cawood v. The State*, 2 Stew. 363.

But it is said that, as the *status* of the prisoner has been changed, since the commission of the offense, by the fundamental law of the land, therefore he can not be punished, either under the statute, or under the common law. No case or principle can be found on record, where the common law prevails, that sustains such a proposition. On the other hand, all the analogies of the common law, with reference *to common-law offenses*, are in opposition to such a conclusion. If a dean murder his bishop, it was *petit* treason at common law; and so of a wife who murdered her husband, or a servant his master; yet the fact that the relation or *status* ceased before the trial, and the dean was free from his allegiance to his superior, the wife from that due her husband, or the servant that due his master, neither exonerated them from the crime and punishment of petit treason, nor murder. They could be indicted for either, though their *status* had been changed; and all that was necessary to be averred in the indictment, in addition to the usual form for murder, was, that the prisoner, then and there being a dean to the deceased bishop, or wife to the deceased husband, or servant to the deceased master, "did feloniously," &c.; and, on such indictment, could be convicted of petit treason, murder, or manslaughter.

In the case of *Swan & Jeffreys*, (Foster's C.L. Rep. 104,) there were two indictments found, one against them jointly for the murder of —— Jeffreys, and another charging Swan with petit treason, and Jeffreys with murder, for the same offense as the first indictment. The prisoners pleaded in abatement the pendency of the first indictment. "The

court was of opinion that the charge in the bill last found must be answered, notwithstanding the pendency of the former; for *autrefois arraign* is no plea in the case." And the court (Wright and Foster, justices) further said: "With regard to the prisoner Jeffreys, the offense charged in both indictments is exactly the same, as well in consideration of law, as in point of fact; with regard to Swan, the *fact* in both is the same; and so in the substantial part of the charge, '*willful murder of malice prepense*'; but falling under a different consideration in the second indictment, merely from the *relation* the prisoner is supposed to stand in to the deceased: and if that relation should not be made out in proof, yet he may be found guilty of murder upon that indictment. And therefore, as the ends of public justice would be fully answered, in regard to both prisoners, by trying them on the indictment for petit treason and murder, the court proposed to the King's counsel, that the first indictment be quashed by consent; to which they agreed"; and both were found guilty as charged, and executed. 1 East's C. L. 338; 1 Hale's P. C. 374; 4 Black. Com. 203.

Though petty treason and murder were punishable in different degrees of severity, yet, death being the result, they are, nevertheless, held to be substantially the same offense, and may be joined in one indictment; and that against two persons who participated in the homicide. Foster's C. L. 336.

The relation of master and slave is a *status* recognized by the common law; also that of husband and wife.—1 Bish. mar. p. 718; Cobb on Slavery; §§ 151, *et seq.*

In the case of *John (a slave) v. The State*, (24 Miss. 558,) it was held, that "the ownership of the prisoner was in no respect an ingredient of the offense charged, which was complete, when it was shown that one human being was willfully, feloniously, and maliciously killed by another human being." This is within the definition of murder, and in harmony with the opinion of Chief Justice Walker in *Isham v. The State, supra;* and it settles that the unlawful killing of a human being by a slave, was an offense at common law. The *status* of the slave is not an ingredient of the crime of murder, but it was of petty treason.

The case of *Bradley v. The State,* (18 Ala. 540,) is in harmony with the case of *Jones v. The State, (supra,)* and both are to the point now under discussion; and this court has made no decision in conflict with the cases referred to in this opinion taken from the Reports of this State.

It is said that the general law in the Code, as to offenses and their punishment, does not apply to slaves. If conceded, that would be a reason why the common law is applicable. But, how can it be said that the statute law as to other persons is any more general, than that applicable to slaves, when there were nearly as many slaves as other persons in the State?

Suppose there had been no statute, such as section 3312 of the Code, at the time the prisoner committed the offense; would it have been contended that he could not have been indicted, and convicted, and punished, by the common law? It certainly could have been done; and this case now stands on the same ground and principle as if section 3312 had never been adopted; or, if adopted, had been, or had never been, repealed; and a change of *status* could not have exonerated him from punishment. To hold that it does, would be to assert that, should a slave commit a crime known to the common law, and then be emancipated before his trial, it would be a valid defense; which *cannot be by any law.*

At common law, the death penalty was denounced against murder, whether by a slave or free person; and neither the emancipation of the one, nor the enslavement of the other, would have worked a discharge from punishment for offenses at common law.

Again, if it is to be held that sections 3080 and 3081 of the Code are to be construed as a new statute, repealing a former one by implication, or as substituting a new punishment, without any saving clause as to offenses committed; and that therefore the prisoner cannot be punished under the law as it stood at the commission of the offense, or under the new—that is, section 3080—I have this to say: that repeals by implication are never favored in law, and that such a repeal only affects so much of the prior law as is repugnant to the new. In so far as section 3080 authorizes the infliction of the death penalty for murder, it is in har-

mony with section 3312, and with the common law; and, therefore, under the doctrine laid down by Mr. Bishop, (vol. 1, Cr. Law, § 94) the common-law punishment is not repealed.

When a freedman is now tried for an offense committed while a slave, he should be tried by the mode prescribed for other free persons; and if for murder, and he is found guilty, as in this case, of murder in the first degree, and the jury affix the death penalty, then that penalty should be inflicted, for he has a free man's trial and punishment, and one which was prescribed at the time the crime was committed, as to a slave convicted of murder, and, to that extent, had not been repealed by the destruction of the institution of slavery, or by the applicability of section 3080 to freedmen who afterwards committed murder. If, on conviction, he had been sentenced to the penitentiary, then, and not till then, could the doctrine of a new punishment be invoked *in his behalf.*

In this case, the prisoner was found guilty of murder in the first degree, and the death penalty was affixed by the jury, and the prisoner sentenced accordingly. So far, the penalty was the same when the prisoner committed the offense, and at the time of trial; and he cannot be heard to complain that the result had been reached by different processes or modes of proceeding. He is sentenced to the punishment annexed to the crime when he committed it; and the law will not allow him to say, even if so, that the punishment had been mitigated, or *is the same,* by the new law, as a valid defense; for he has only received what he bargained for,—*if crime* and its punishment are to be treated, as some authorities in this country seem to do, as a contract between the State and criminal, that only the punishment prescribed at the time of the offense is within the terms of the bargain; which is an erroneous view of the whole subject.

Mr. Bishop says (Cr. L. § 94): "When a provision of law is so modified, or cut short by a later one, it is not, in any proper sense, repealed; and we may lay down the doctrine broadly, that no repeal takes place, if the earlier provision can stand *to any extent* with the latter."—10 Màrt. La. R.

Burt (a freedman) v. The State.

155, 172.   In explanation of the phrase "provision of law," he says in the same section, "and by provision of law we must understand, not necessarily an entire section of a statute, or cluster of common-law doctrines, but the *smallest subdivision of legal principle which can be fairly made.*"

Applying these principles, it is apparent that section 3080 of the Code does not repeal the common law as to the offense or punishment of murder *in toto ;* nor does it change the ingredients of the crime of murder. It is distinguished by sections 3080 and 3081 into degrees, for the purposes of punishment only.

Again, the civil and criminal laws were suspended from the occupation of the United States army, in May, 1865, to the 20th July, 1865, when Governor Parsons, by his proclamation of the latter date, put in force certain laws *from that date.—Jeffries v. The State, at present term.*   The slaves were liberated by the same act which suspended the State laws; and section 3080 was never in force, as to freedmen, until put in force on the 20th July, 1865, by the proclamation. We must, therefore, look to it to see its effect, as it is the only act which has put section 3080 in force after its suspension ; for neither the convention, nor the general assembly of the State, has attempted to do so.

As to this question, the language of the proclamation is : "*From and after* this date, the civil and criminal laws of Alabama, as they stood on the 11th day of January, 1861, except that portion which relates to slaves, are hereby declared to be in full force and operation ; and all proceedings for the punishment of offenses against them will be turned over to the proper civil officers, together with the custody of the person charged ; and the civil authorities will proceed in all cases according to law." Now, it seems clear to me, that the proclamation has a saving clause as to "all proceedings for the punishment of offenses"; and to that end requires "the person charged to be turned over to the custody of the proper civil officer," and "the civil authorities "to proceed in all cases according to law." What law ? The law applicable to the offense and the punishment; and, as I understand it, the law applicable at the time the offense was committed ; for it would be unconstitutional to

apply any other, unless as hereinafter shown. "According to law," means the law in force when the crime was committed; and as to this case, that was the common law.

If this clause of the proclamation is not to be construed as a saving clause, what was the use of the governor ordering that all proceedings for the punishment of offenses, and the custody of all persons charged, should be turned over to the civil authorities? If this is not its proper construction, it seems to me to be meaningless as to freedmen who had committed offenses while slaves. Slavery was then destroyed. The convention did not do it; the convention only recognized its destruction, and prohibited its existence thereafter. That action can possibly have no effect on the question at issue.

The Code, except the slave laws, and such portions as had been repealed before the 11th January, 1861, was put in operation by the proclamation, from its date; and as to its application to freedmen, for crimes and punishment, its proper construction is, that it was put into operation as to all offenses *thereafter* committed, and leaves prior offenses to be punished by the former law.—1 Bish. C. L. § 106; 1 Leigh's R. 559; 2 *ib.* 727. Besides, the Code was put into operation as a new and entire system, as far as it was in force on the 11th January, 1861, and was made applicable to freedmen from the 20th July, 1865; and if so, it must be construed *in pari materia*, as an entire system; and such being the case, sections 12 and 14 are saving clauses, and authorize the punishment of the prisoner under the former law, which, as to him, was the common law. The proclamation evidently intended that freedmen, who had committed crimes while slaves, should be punished according to some law; if not by common law, then by the Code; and either suits the necessities of this case, and, as I have shown, are in harmony with each other. The proclamation was, in effect, a re-enactment of the Code, so far as it was in force on the 11th January, 1861, as to the freedmen; and sections 12 and 14 of the Code should be construed as though enacted on the 20th July, 1865, as to freedmen; and such was the construction which this court, at this term, in the case of *Jeffries & Jeffries v. The State*, gave to the saving clauses

Burt (a freedman) v. The State.

of the act of the 7th October, 1864, when ratified by the convention on the 21st September, 1865. They were construed as though adopted on the day of ratification, as to offenses committed by freedmen prior to that date, and subsequent to the date of the proclamation. Saving clauses are always favored, and construed liberally to promote the ends of justice ; and so are remedial statutes, though penal.

The rule which requires penal statutes to be strictly construed, applies to the offense, and not the punishment, which, as hereafter shown, is remedial. The case of the *Commonwealth v. Kimball*, (24 Pick. 369,) and other cases here cited, sustain this position : *Sprowl v. Lawrence*, 33 Ala. 674 ; Smith on Statutes, §§ 516-18 ; Dwarris, 563, 614-18 ; 9 Wheaton, 381; 1 Penn. 211; 1 Ham. 256; 2 *ib.* 74; 3 *ib.* 198.

Now, to the second branch of this opinion : If the first branch of this opinion is unsound in its conclusion, and it is correct to hold that the proclamation of the governor put in operation the Code, so far as unrepealed on the 11th January, 1861, from the 20th July, 1865, as to freedmen, and that the saving clauses above referred to do not affect offenses committed prior thereto, nor save the punishments prescribed for such offenses at the time of their commission by freedmen previous to their liberation; then I hold, that *the punishments prescribed by sections* 3080 *and* 3081, *for murder, are, in part, the same as the common-law punishment, and, as to the balance, are in mitigation of the law as it existed at the commission of the offense; and, therefore, such punishments can be inflicted, without being obnoxious to the constitutional provisions against* EX-POST-FACTO *laws and laws "established and promulgated" after the offense.*

Section eight of the declaration of rights provides, "that no person shall be punished, but by virtue of a law established and promulgated prior to the offense, and legally applied." The first clause of the above provision evidently applies to the law creating the offense ; and the latter clause, contained in the words "and legally applied," relates to the remedy prescribed by the law at the time of trial; and punishment is held to be of the latter. The first clause was inserted to meet a hardship which existed at

41

common law, by which every act of parliament, creating an offense, was referred to the first day of the session, (1 Kent's Com. 456,) and consequently many persons have been found guilty, in England, of offenses committed before the law was established and promulgated; and the latter clause, no doubt, was adopted to prevent the infliction of punishment illegally, as was done in the celebrated case of the *Earl of Strafford*, and in similar cases.

This view is sustained by the authorities cited upon the construction of the words "*ex-post-facto* laws" in the federal constitution, which I now proceed to discuss. Before doing so, I call attention to the case of *Dickinson v. Dickinson*, (3 Murph. N. C. R. 327,) as sustaining the construction above given to section eight of the bill of rights.

The common law recognized the rule against *ex-post-facto* laws; but, at the same time, it did not conflict with the rule, that every act of parliament was considered in force on the first day of the session; and hence the necessity of the provision of the bill of rights, that no person should "be punished, but by virtue of a law established and promulgated prior to the offense." Judge Story (Commentaries on Constitution, § 1345) says: The general interpretation has been, and is, that the phrase" *(ex-post-facto* laws*)* "applies to acts of a criminal nature only; and that the prohibition reaches every law, whereby an act is declared a crime, and made punishable as such, when it was not a crime when done; or whereby the act, if a crime, is *aggravated* in enormity or *punishment;* or whereby different or less evidence is required to convict an offender, than was required when the act was committed." He says in the same section: "Laws, however, which mitigate the *character* or *punishment* of a crime already committed, may not fall within the prohibition; for they are in favor of the citizen;" and see authorities cited by him in a note. He refers to the case of *Calder v. Bull*, (3 Dallas R.,) in which Chase, J., in delivering the opinion of the court, lays down four rules to determine whether or not a law is *ex-post-facto* within the meaning of the constitution; and the 3rd rule is: "Every law that changes the punishment, and inflicts a *greater* punishment than the law annexed to the

crime when committed," is obnoxious to this provision of
the constitution. It will be observed, that the rule not only
requires that the punishment be changed, but it must also
inflict a greater one. It follows that, if the punishment is
changed, and made lighter, or mitigated, it is not obnoxious
to the constitutional provision; and the case of *Calder v. Bul*
has frequently been recognized by the supreme court of the*l*
United States as authority on this question, and approv-
ingly; and as late as the case of *Carpenter v. The State of
Pennsylvania* (17 How. 463). And it has been followed by
several of the State courts, and not disavowed by any.
4 Geo. 205; 6 Binn. 271; 5 Mon. 133 ;⅓1 Black. (Ind.) R.
195; 6 Texas, 347; 2 Root, 350 ; 2 Pick. 170 ; 9 Mass. 363;
7 Johns. 488; 1 J. J. Mar. 563; 2 Peters, 681; 2 Stew. &
Por. 199; 3 Mar. 327.

In the case from 6th Texas, the court says, that the act
" did not inflict a *greater* punishment than the law annexed
to the crime when committed; it did not authorize a con-
viction upon less evidence than the law required at the
time of the commission of the offense ; consequently, it is
not, in reference to the offense charged, an *ex-post-facto*
law."

In the case of *Strong v. The State*, (1 Black. Ind. 193,)
which was an indictment for perjury, and at the time the
offense was committed the punishment was whipping not
exceeding one hundred stripes, but, at the time of the trial
and conviction, the punishment had been changed to con-
finement in the penitentiary, not exceeding seven years;
and the prisoner was convicted, and sentenced to hard labor
in the penitentiary for a year and a day; the supreme court
of Indiana affirmed the judgment of the court below, on
the authorities of the cases from 3 Dallas, *(supra,)* 2 Binn.
238–9, and cases cited in note 2, appended to the report of
the case; and upon the distinct ground that the punish-
ment *was not increased* by the latter act.

The same rule is recognized, in effect, in *Clarke v. The
State*, 23 Miss. 261. And this court, in the case of *Smith v.
The State*, (1 Stew. 506; 2 Stew. & Por. 199,) also substan-
tially, but impliedly, recognized the same rule; which is the
only time the question has been presented in any shape in

this court. In the case of *Jones v. The State,* *(supra,)* there is an intimation in the same direction. Mr. Bishop (1 Crim. L. § 95 to § 109) is very clear and explicit on this subject. He says: "We may separate the offense from the punishment; and a statute which provides a new punishment for an old offense, may operate as a repeal of that part of the old law which relates to the punishment, but of no more. A party offending will then be indicted either at common law, or under the old statute, as the case may be, leaving the court to inflict the punishment ordained by the new, or under the new statute, at the election of the prosecutor." He says ((§§ 102, 103) : " All law is divisible into that which concerns the right, and that which concerns the remedy. Rights are determined by the legal rule prevailing at the time and place when and where the fact transpired : remedies by that of the *place* where they are sought to be enforced, as it exists at the *time* the proceedings are carried on and the judgment rendered. According to this division, the punishment, which, we have seen, is to be treated as separable from the offense, belongs to the remedy. A prisoner, therefore, is to receive the sentence legally provided for him at the time it is pronounced by the court."

All this was so at common law, which also recognized, as a rule of law, our constitutional provision against *ex-post-facto* laws; but, at common law, this rule was held to apply to a law creating or aggravating an offense, and not to the punishment, *it* being the remedy. And when the rule was incorporated in our constitutions, it should still have received the same construction and application as at common law ; and no substantial reason has ever been given, why our courts should have departed from its common-law interpretation. But the American courts have only made a departure thus far, that, where the punishment is *aggravated* by a law passed subsequent to the commission of the offense, it is held to be obnoxious to the rule, and cannot be inflicted.

Mr. Bishop (1 vol. C. L. § 108) lays down the rule thus : " The general doctrine, that an offense may be subjected to such punishment as the law provides at the time of judgment rendered, though a different one was attached to it

when committed, is limited, in this country, by the constitutional inhibition against *ex-post-facto* laws, which binds both the Federal and State legislatures. A statute, to be obnoxious to this constitutional guaranty, need not require that acts, innocent when committed, be punished; but it is equally so if it imposes a *heavier* penalty than was at the time known to the law. If, however, the statute be *in mitigation, it is not liable to this objection.*" This is clear, explicit, and luminous.

It requires no argument to demonstrate, that the punishment prescribed by sections 3080 and 3081 of the Code, for murder, are in mitigation of the punishment prescribed in section 3312, and the common law; except in so far as they are the same as above shown. If not, then murder in the second degree, under section 3081, is punished heavier than under section 3080, which allows the death penalty. Penitentiary confinement is certainly in mitigation of death.

All the British and American authorities are in harmony with Mr. Bishop, unless in some loose and unguarded expressions, in cases where the question was not discussed, and was not legitimately before the court for adjudication. *Rex v. McKenzie*, Russ. & Ry. 429; *People v. Townsey*, 5 Den. 70; *Roberts v. The State*, 2 Overt. 423; 1 Bish. C. L., § 96 to 109, and notes,

Nor is the mitigated punishment obnoxious to the constitutional provision, as to the necessity of the law being " established and promulgated" prior to the offense; for that, as shown, clearly has reference to the offense, and not to the remedy or punishment; or, if to the punishment, then it can have no greater force than the constitutional provision against *ex-post-facto* laws, and must in this respect receive the same interpretration and construction, and be given the same application, and it only differs, as hereinbefore shown, as to the offense.

So, from any view of the law applicable to this case, the crime and the culprit should not go "unwhipt of justice." The grave interests of law, humanity, good order, private security, and public justice, should not be sacrificed, on so narrow and technical a criticism as would seek to make the *status* of a slave a substantial ingredient of the crime of

murder, or of its punishment, when that crime has been committed by him, and thereby to let the guilty go free of all punishment, when the punishment at common law for murder was the same to *bond and free.*

If the prisoner is to be discharged, the anomaly will be presented, that a white man may still be convicted and punished with death for the murder of a slave; and the slave, for the same offense, on a white man or slave, be discharged; and, even, a white man and a slave may have participated in the crime, and the former be convicted, while the latter is acquitted, although both are guilty. Against so singular a result I would labor hard, before I would be instrumental in producing it. There is not an adjudged case to sustain the position, *that the prisoner goes quit of the punishment of his crime on the event of his liberation; on the other hand, reason and principle, and all the analogies of the common law, are against such a conclusion.*

Both branches of the argument may be summed up, in short, as follows: At the time the prisoner committed the offense, slavery was recognized by the common law of this State, if not of this country; and a slave was recognized as a human being, subject to the punishment inflicted by the common law for the commission of offenses known to that law: that the statute, (Code, § 3312,) as to the crime of murder, is declaratory, and in affirmance of the common · law of this State and country; and being so, the repeal of that statute does not repeal the common-law offense and punishment; and that the amelioration or change of the *status* of the prisoner, subsequent to the commission of the offense, does not exonerate him from that punishment. And, secondly, if the destruction of the institution of slavery, and the applicability of the punishments provided for murder by sections 3080 and 3081 of the Code, to freedmen, repealed, by implication or otherwise, the penalty prescribed by law at the time of the commission of the offense, or substituted a new punishment, yet, that punishment is in part the same, and to that extent may be inflicted; and as to the other part, is in mitigation of the punishment in force at the commission of the crime; and in this case, the verdict of the jury and the law have brought the crime within the de-

gree punishable as at the commission of the offense, as also authorized under section 3080 of the Code—*the death penalty ;* and thus the offense and penalty are the same in this case as provided by the law at the commission of the offense, and the prisoner, if punished, as sentenced by the court below, would be punished according to the provisions of both laws ; *and so a good conviction and punishment under either law.* But, if sections 3080 and 3081 mitigate the punishment prescribed by the law at the commission of the offense, upon the doctrine before stated, if the prisoner had been found guilty, and sentenced to the penitentiary for life, or for a less term, he could still have been punishable in that form, as it was in mitigation of the death penalty ; and that a statute, mitigating the punishment which was prescribed when the offense was committed, or prescribing the same punishment, is not obnoxious to the constitutional provisions against *ex-post-facto* laws, or laws established and promulgated after the commission of the offense.

There is a case pending in this court, of the murder of a slave by a slave, of an aggravated nature, as presented in the bill of exceptions. This opinion is written as applicable to that and all similar cases.